2024 IL App (1st) 230920-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
September 30, 2024

No. 1-23-0920

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 09 CR 02787 |
| | ) | |
| JOSE ESTRELLA, | ) | The Honorable |
| | ) | Timothy J. Joyce, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court affirms the trial court's denial of petitioner's postconviction claim of actual innocence following a third-stage evidentiary hearing. The appellate court rejects petitioner's argument that his postconviction counsel failed to provide a reasonable level of assistance in second-stage proceedings.

¶ 2   Petitioner José Estrella appeals from the denial of his petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2022)) following a third-stage evidentiary hearing on his claim of actual innocence. He also raises a claim that postconviction counsel failed to provide reasonable assistance in second-stage proceedings. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4 In this court's earlier decision on direct appeal, we set forth in detail the evidence adduced at petitioner's bench trial and at a subsequent evidentiary hearing in connection with his posttrial motion for a new trial. See *People v. Estrella*, 2014 IL App (1st) 120367-U. We have also set forth facts concerning this incident in appeals by two of petitioner's codefendants. See *People v. Padilla*, 2013 IL App (1st) 120366-U; *People v. Smith*, 2014 IL App (1st) 130836-U. Below we restate only those facts necessary for an understanding of the issues raised in this appeal.

¶ 5 On the evening of July 23, 2007, the victim in this case, Juan Reyes, was on the 2700 block of West Haddon Avenue in Chicago, where many other people were also gathered. Reyes was a member of a gang known as the Spanish Cobras, as were at least some of the others present. Around the timeframe of 8 to 9 p.m., Reyes, who was then heavily intoxicated, engaged in a verbal confrontation of some nature with a woman who lived on the block. He walked away from her but remained nearby. That woman apparently had some form of close relationship with a senior member of the Spanish Cobras, and that senior gang member was contacted regarding Reyes' altercation with the woman. A few minutes later, several additional men arrived on the scene in vehicles. The witness testimony differed slightly as to how many men arrived and whether any of them interacted with Reyes. However, the testimony was consistent that the arrival of these men prompted the people with Reyes to attempt to persuade him to get into a car and leave.

¶ 6 Reyes had arrived on the block that evening with his friend Kenneth Holowka. As Reyes was attempting to enter Holowka's car on the front passenger side, a group of about three to five young men approached, and Reyes was pulled from the car. Reyes fell to the ground, and a larger group of people—estimated by witnesses to have been between 5 and 12 people—began to use their hands and feet to punch, kick, and stomp on Reyes. The evidence was that this was a gang "violation" administered by younger members of the Spanish Cobras pursuant to orders of a more

senior gang member as punishment for Reyes' altercation with the woman. The beating lasted only one or two minutes, after which those involved in it left the area. However, Reyes sustained severe injuries as a result of the beating, including a fracture of his first cervical vertebrae and severe damage to his spinal cord in that area, from which he died later that night.

¶ 7        At petitioner's bench trial, the primary contested issue was whether petitioner was an active participant in the beating that led to Reyes' death or whether he was merely present on the block that night. The State presented the testimony of three eyewitnesses who identified petitioner as having been one of the active participants in the beating. The State also presented forensic evidence that a fingerprint belonging to petitioner had been lifted from the rear passenger window of the car from which Reyes had been pulled immediately before the beating. The defense presented the testimony of one witness who testified that Reyes stood apart from the group involved in the beating. The defense presented other witness testimony aimed at undermining the perception, motive, and credibility of the State's witnesses who identified petitioner as a participant in it.

¶ 8        The first eyewitness was Holowka, who testified that he did not know the identities of anyone present that night other than Reyes. He testified that he was adjacent to his car when Reyes was pulled from it by about five young people. Two additional men stood by Holowka and initially prevented him from calling 911, telling him that the situation did not concern him. The men continued to stand by Holowka for a minute or two while the beating occurred. Holowka testified that during that time, he was able to get a good look at the faces of some of the men who were participating in the beating. He made an in-court identification of petitioner as a person whom he had seen striking Reyes numerous times with both his fists and feet. He testified also that, approximately four months after the incident, he had identified petitioner in a police line-up as one of the participants involved.

¶ 9    On cross-examination, defense counsel attempted to undermine Holowka's testimony identifying petitioner as one of the people actively involved by eliciting testimony that Holowka had been at bars with Reyes since mid-afternoon that day, thereby suggesting that Holowka's level of intoxication was similar to that of Reyes. However, Holowka testified that he had consumed only three to five beers over the course of the day and denied stopping at a liquor store prior to arriving on West Haddon. The defense also elicited that Holowka's only description of the offenders to the police that night was that they were "[t]hree blacks, seven Hispanics, [and] what the offenders were wearing." Holowka also had a 2003 felony conviction for financial identify theft and multiple misdemeanor theft convictions in 2002.

¶ 10    The second eyewitness to testify on behalf of the State was Jackson Gomez, a former member of the Spanish Cobras who lived in the third-floor apartment at the address where the beating occurred. He was familiar with some of the people on the street that evening. He testified that he was inside his apartment with the windows open when he overheard arguing between Reyes and a female neighbor. He saw Reyes walk away from her and stand on the sidewalk in front of Gomez's building. About 15 minutes later he heard further commotion and "people going crazy." He heard petitioner on the phone saying "we have to call somebody." Gomez believed that someone called the woman's brother, who was a ranking member of the Spanish Cobras nicknamed "Brother Ray." At some point a van arrived, and Brother Ray and four men got out of it. Gomez testified that Reyes attempted to leave with his friend, but he was dragged out of the car and told he could not leave. He testified that Reyes then stood on the sidewalk for an additional 10 minutes before the beating began. He testified that someone nicknamed "Gangero" first struck Reyes in the head, and then a group of about five people began kicking and beating Reyes. Gomez testified that petitioner was one of the participants and that he saw petitioner stomp on Reyes with his feet. The beating

lasted about two to three minutes.

¶ 11      When police arrived, Gomez decided not to get involved. However, four days later, Gomez was arrested on an unrelated matter after the police executed a search warrant at his residence and found cocaine and bullets. At the police station, Gomez was asked about the beating of Reyes several days earlier, and he told the police what he had witnessed. He testified that he was not offered any deal in exchange for that information and that he was later sentenced to three years in prison on the offense for which he had been arrested. In November 2007, Gomez viewed a lineup in which he identified petitioner and others as participants in the beating.

¶ 12      In December 2008, while in jail, Gomez met with petitioner's counsel. He signed an affidavit recanting his prior statement to police and stating that he told the police he had information about the beating based on their threats to charge him with possession of drugs that were not his. He stated in that affidavit that he did not see the beating and that he only told police information that he had later learned on the street. At trial, however, Gomez testified that his statements in the affidavit were false. He testified that he signed it only after eight unknown men came to his cell with homemade knives and threatened to kill him if he did not agree to sign a blank piece of paper.

¶ 13      On cross-examination, Gomez was questioned by petitioner's counsel about the meeting he had with her, in which he signed the affidavit recanting his statements to police and stating that it was information he learned secondhand. He maintained that he had signed it only because he had been threatened while in jail. Gomez also acknowledged convictions for various weapons offenses and possession of controlled substances. Gomez was also cross-examined about various inconsistencies and omissions in prior statements he had given involving the beating.

¶ 14      The trial court inquired of Gomez if he saw who pulled Reyes out of the car. Gomez answered that petitioner had been the person who had done this. On follow-up examination by petitioner's

counsel, Gomez acknowledged he had never before stated that petitioner was the person who pulled Reyes from the car.

¶ 15     The third and final eyewitness to testify for the State was Ermelida Luera. Luera testified that she had met Reyes and Holowka for the first time earlier that afternoon at the bar of an Applebee's restaurant where she was having lunch with several coworkers. They spent the afternoon and early evening together at another bar playing pool, and eventually they decided to go to the 2700 block of West Haddon. Luera was not from that neighborhood, and she did not know anyone there other than Reyes, Holowka, and the coworker who had come with her.

¶ 16     Luera testified that Reyes had walked over to where Luera was standing following his altercation with the woman. Several men soon arrived, and their arrival made Luera believe there was going to be trouble. She said to Holowka that they should leave and that he should take Reyes home. She testified that as Reyes was halfway into the front passenger seat of Holowka's car, three teenagers approached, yanked Reyes out of the car, and dragged him to a nearby tree. Suddenly, more than a dozen teenagers jumped on Reyes and were kicking, punching, and stomping on him. This lasted about one or two minutes, at which point the teenagers walked away. Luera, who is a certified nursing assistant, testified that she tended to Reyes until police arrived and told her to get away from him. She waited nearby for an ambulance to arrive, and then she left. Luera testified that she was standing about six feet from where the beating had occurred and was able to see the faces of some of the people involved in it. After seeing a newspaper article about the beating and learning that Reyes had died, Luera contacted the police. On July 30, 2007, she identified petitioner in a photo array as one of the participants in the beating. She also identified photographs of other people who participated in the beating as well as photographs of nonparticipants who had been present at the scene that night. On November 14, 2007, she identified petitioner in a lineup. And

she made an in-court identification of petitioner as one of the individuals who beat Reyes.

¶ 17    On cross-examination, Luera was questioned about how much alcohol she and Holowka had consumed prior to the beating. She testified that she had three drinks during the day and was given another cup of Hennessy when they arrived on West Haddon. She also testified that she had seen Holowka come out of a liquor store and that he was drinking Hennessy on West Haddon. Luera was also questioned about an interaction she had with petitioner's counsel in a hallway of the courthouse in June 2010, which occurred in the presence of several men whom Luera believed were friends of petitioner. Luera denied telling counsel that all the men involved looked the same when counsel attempted to show her a photograph of petitioner.

¶ 18    The defense presented the testimony of John Vergara, a one-time member of the Spanish Cobras who was by then acting as a volunteer "interrupter" with CeaseFire, an organization that works to prevent gang violence. Vergara has been familiar with the 2700 block of West Haddon nearly his whole life. He was a longtime friend of Reyes and knew petitioner also. That evening, he received a call from the CeaseFire office to go to West Haddon in response to a possible problem. He arrived in his car and began walking toward a crowd that had gathered under a tree where an argument or a "little fight" had broken out. He saw petitioner walking away from it toward him. He asked petitioner what was going on; petitioner said he did not know, but it was something involving Reyes. Vergara testified that after petitioner said this, Vergara suggested that they cross the street and walk the other way. They stood across the street from the fight. When it ended, they saw Reyes on the ground. Vergara testified that petitioner then went over to Reyes and was trying to hold his head and wake him up. He testified that Holowka appeared "drunk out of his mind." He also testified that Gomez came up to him later and asked him what happened.

¶ 19    On cross-examination, Vergara acknowledged that despite coming to the scene as an

interrupter for CeaseFire, he stood across the street with petitioner instead of attempting to interrupt the fight. He also testified that it was too dark for him to identify anybody at the scene other than petitioner, whom he was able to recognize from three or four houses away.

¶ 20        Israel Torres, who is legally blind and uses a wheelchair, testified that he had been with Reyes, Holowka, and petitioner earlier in the afternoon on West Haddon and that Reyes and petitioner walked over to Holowka's car to look at it. This testimony was later used to argue that an explanation existed for why petitioner's fingerprint was on Holowka's car window. Leah Mayers, who assists petitioner's counsel with cases, testified to the conversation between Luera and petitioner's counsel in the courthouse hallway in June 2010. She testified that when counsel showed Luera a photograph of petitioner and asked what she had seen him do, Luera said that she did not remember and that it was "[w]hatever I said before." Luera also said that everyone involved looked alike to her. Rolando Galindo, an intern in petitioner's counsel's office, testified that he was present when petitioner's counsel spoke to Gomez in the jail. He testified that Gomez stated he did not want petitioner to go to prison for something he was not involved in and that he had identified petitioner to police only after they threatened him with additional drug charges.

¶ 21        Following the completion of testimony and closing arguments, the trial court found petitioner guilty of first degree murder. In ruling, the trial court conducted an extensive review of the evidence and discussed its assessment of the credibility of the witnesses for both sides. It discussed the fact that both Holowka and Gomez were witnesses with "baggage." Holowka had prior felony convictions bearing on dishonesty, and there was testimony suggesting he had drunk an appreciable amount with Reyes that afternoon. Gomez also had multiple prior felony convictions, failed to come forward to police until he was facing the possibility of his own arrest, recanted his prior statements identifying petitioner in the beating, and then later testified that his recantation

affidavit was false. However, the trial court stated that it also found Vergara to be "absolutely incapable of belief." It cited the fact that Vergara claimed that it was too dark for him to recognize anybody involved in the beating, despite his lifelong relationship with the people in the community as both a gang member and interrupter.

¶ 22    The trial court then discussed at length the extent to which it found Luera to be a credible witness. It cited the fact that she was not from the neighborhood and had no connection to any of the people involved, other than having met Reyes and Holowka earlier that afternoon. It commended the fact that she had voluntarily come forward to the police with information after learning that Reyes had died. Regarding her identification of petitioner, the court noted that she was standing close to the beating when it happened and was able to identify a photograph of petitioner at the police station a few days later. The trial court found her identification of petitioner to be bolstered by the fact that she also successfully identified a photograph of Torres as being a person who had been present at the scene in a wheelchair, notwithstanding that the photograph of Torres that she viewed did not show him in a wheelchair. It also cited the lack of any evidence that she had incorrectly identified a photograph of anyone who was demonstrably not present.

¶ 23    Following the conviction, petitioner moved for a new trial on the basis of the posttrial discovery of two new eyewitnesses prepared to testify that petitioner was not a participant in the beating. The trial court conducted an evidentiary hearing to evaluate their testimony.

¶ 24    Jason Ares testified that he had been on the 2700 block of West Haddon on the afternoon and evening of the day at issue. Ares was acquainted with both Reyes and petitioner, and he had been introduced to Holowka earlier that day. That evening, he witnessed Reyes get into a verbal argument with a woman. The woman said she was going to call her brother, and Ares testified that was when he told Reyes to get into the car and leave. Ares testified that he also saw petitioner on

the street at this time and that petitioner also told Reyes to get into the car and leave. Ares saw about five or six guys approaching and then saw Reyes "on the floor getting stomped." The beating lasted 20 to 30 seconds. Asked where petitioner was at this time, Ares stated that petitioner took off down the block and met up with one of the guys from the neighborhood who works for CeaseFire. After the group dispersed, petitioner came back over to Reyes, and petitioner and Ares elevated his head so he would not choke. Ares did not speak to the police when they arrived because he did not want to be involved. Ares testified that he did not recognize any of the people who participated in the beating.

¶ 25     On cross-examination, Ares volunteered that he was intoxicated on the night at issue. Asked if he was drunk that night to the point that he did not know what was going on, he answered, "Pretty much, but I know that somebody got beaten." The trial court inquired of Ares whether anybody else came to assist petitioner and him when they were sitting with Reyes after the beating. Ares answered, "No. Supposedly some girl that supposedly was a nurse went up there, but I didn't see her try to help him." Ares explained that he learned this information from petitioner's counsel.

¶ 26     The second witness, Jose Antonio Medina, testified that on the evening at issue, he was dropped off after work at the home of a coworker who lived on West Haddon. He testified that petitioner was somebody he would see around the area and that he knew Reyes also. That evening, he observed Reyes arguing with a woman and then saw that woman make a phone call. That is about the point at which he first saw petitioner, when petitioner walked up to Medina and asked him what was going on there. Two more men then arrived on the scene in a van. The men were trying to move Reyes away and keep him from bothering people. Several more young men then arrived in a white truck and started arguing with Reyes. Reyes got into a car, and the men continued to argue with him through the car window. Reyes got back out of the car, and the men started

pushing and hitting him. The beating lasted about 30 seconds to a minute. Medina testified that prior to the beating, petitioner had walked over to a man with tattoos and remained with that man through the time the beating ended. Medina then saw petitioner helping Reyes by putting his head on his lap. The man with the tattoos and a Latina woman were with him also. During his testimony, Medina was shown a photograph of petitioner; he stated the person shown was "the guy that was in the car" on the driver's side, whose name Medina did not know.

¶ 27　　　　The trial court denied the motion for a new trial, based upon its finding that neither Ares nor Medina were credible in their testimony. The court took issue with the inability of either witness to testify to the details of what he observed of the beating itself and the people involved, as opposed to merely stating that petitioner had not been involved. It reasoned that this "flies in the face of human nature," as any rational person would pay attention to the participants and what they were doing, particularly in a neighborhood where many people knew one another. The court reasoned that the ease of stating that a particular person was uninvolved while simultaneously offering no details about what did occur or who did participate rendered their testimony unbelievable.

¶ 28　　　　The trial court then sentenced petitioner to 22 years in the Illinois Department of Corrections. Petitioner filed a direct appeal, in which he argued that his trial counsel had been ineffective for declining to sever his trial from that of his codefendant, Rafael Padilla, who gave a statement that could arguably be interpreted as implicating petitioner as a participant in the beating. This court affirmed based on the absence of any prejudice to petitioner from Padilla's statement, due largely to the trial court's extensive reliance on the testimony of Luera as credibly identifying petitioner as a participant. *Estrella*, 2014 IL App (1st) 120367-U, ¶ 47. The supreme court thereafter denied leave to appeal. *People v. Estrella*, 23 N.E.3d 1203, 388 Ill. Dec. 5 (2015) (Table).

¶ 29　　　　On February 27, 2020, petitioner filed the present postconviction petition that is the subject

of this appeal. He raised a claim of actual innocence. In support of this claim, he attached the affidavit of Timothy Smith, one of petitioner's codefendants who had been tried separately from petitioner. In that affidavit, Smith acknowledged his own participation in the beating of Reyes but averred that petitioner had not participated in any way.

¶ 30    The petition was advanced to second-stage proceedings, and counsel was appointed. On May 12, 2022, counsel supplemented petitioner's claim of actual innocence with an affidavit from a second former codefendant, Marquis Ollie, who similarly acknowledged his own participation in the beating and stated that petitioner did not participate.

¶ 31    At this point, the State filed a motion to dismiss on the basis that neither witness' testimony was "newly discovered." The State cited Smith's statement to police, in which he stated that petitioner had not participated in the beating. The State pointed out that at petitioner's trial, he had been granted leave to use Smith's statement in evidence, but his counsel declined to do so. As to Ollie, the State pointed out that Ollie had pled guilty to attempt murder over one year prior to petitioner's trial and was therefore available to be called as a trial witness by petitioner. The trial court denied the State's motion to dismiss and advanced the petition to third-stage proceedings.

¶ 32    On February 23, 2023, the trial court conducted the third-stage evidentiary hearing that serves as the basis of this appeal. Ollie was the first to testify. He explained that he knew petitioner from growing up with him around the neighborhood and that he knew Reyes from gang ties. Ollie was 15 or 16 years old at the time of this incident. That evening, he was present when Reyes got into a fight with the sister of a senior gang member named Ray. Because of this incident, Ray ordered a "violation" on Reyes. Ollie testified that when the violation occurred, petitioner was across the street watching and did not throw a punch or kick. After the beating occurred, Ollie saw petitioner come back across the street and try to help Reyes. Ollie left soon after the beating occurred. On

June 1, 2010, Ollie pled guilty to attempt murder and was sentenced to 12 years in prison at 85%.

¶ 33    On cross-examination, Ollie was questioned about who was present and heard Ray order the violation. He answered that it was "the guys that was there, the gang members," but he could not remember who Ray told directly or everybody who was present. The group of gang members who would have heard this included more than 10 people. Ollie also acknowledged that when he pled guilty, he had sworn to facts identifying petitioner, along with Smith, Rafael Padilla, Felix Padilla, and Joey Rivera, as people who " 'all participated in this violation to varying degrees.' "

¶ 34    The court then inquired of Ollie as to specifically which 10 gang members were present when Ray ordered the violation. He named himself, Rafael and Felix Padilla, Smith, Rivera, petitioner, Ray, "Python," and "Scar Face." He testified that five of them then participated in the violation. He stated that Smith punched Reyes first, and then Ollie, Rivera, and the two Padilla brothers all kicked him after that. The other gang members, including petitioner, did not do anything.

¶ 35    Smith testified second. He had recently been released from the Illinois Department of Corrections based on a 2018 guilty plea related to this incident, which followed this court's reversal of his 2012 conviction in a jury trial. See *Smith*, 2014 IL App (1st) 130836-U. He testified that on the night at issue, he arrived on West Haddon with petitioner in petitioner's car. Over ten other people were present in addition to the two of them and their four eventual codefendants. Smith testified that he did not know the names of all the other Spanish Cobras present, but he identified two as "Heck" (a nickname for someone named Hector) and "Thriller."[1] Smith testified that when he and petitioner arrived, Reyes was also present and was verbally arguing with a man named Raymond, who was the gang chief of the area. Raymond then gave an order that Reyes be given a

---

[1] The transcript of Smith's testimony includes both the nicknames "Trella" and "Thriller." It appears that both nicknames are a reference to a single individual.

"violation" by the other gang members, which Smith understood to mean that he be punched.

¶ 36    Smith testified that he then walked toward a car where petitioner was standing next to Reyes. Smith said to petitioner that Raymond wanted to talk to Reyes again. Reyes and Raymond then had further verbal argument, at which point Smith intervened by punching Reyes, pursuant to the order Raymond had given. Smith testified that he saw petitioner walk in the opposite direction across the street, although Smith stated further that he was mostly focused on the violation. He stated that the people participating the violation included himself, Ollie, Rafael Padilla, "and a couple other individuals *** that wasn't on our case." The individuals were punching and kicking Reyes, but petitioner was not involved. The incident lasted about three minutes. Petitioner then returned with John Vergara and tended to Reyes. Petitioner also waved down an ambulance. Smith ran away after Kenneth Holowka pointed at him and identified him as someone involved.

¶ 37    The court again inquired by pressing Smith about who had been present when Raymond had given the order for the violation and about who had participated in the beating. In addition to naming the codefendants who were charged, Smith identified "Heck" and "Thriller" as nicknames of others who were present and participated. The court asked further questions about who these men were. Smith testified that "Heck" was a nickname for Hector; he did not know Hector's last name, but he was a Spanish Cobra who lived on the block. Smith stated also that he only knew "Thriller" by his nickname. Smith gave evasive answers to the court's questions about whether he had ever told police of the involvement of Heck or Thriller in this incident.

¶ 38    Following arguments of counsel, the trial court denied petitioner's postconviction petition. In ruling, the court stated that it did not find Ollie or Smith believable in their testimony that petitioner had not been involved in the beating of Reyes. The court reiterated that it was easy for these two witnesses to state that petitioner was not involved and to blame it on the other

codefendants whose cases have been resolved. However, both witnesses testified that others were present and participated whom they professed not to know well enough to identify by name. The court found this incapable of belief, due to these being the same gang members with whom they frequently spent time on this street, along with the memorable nature of this fatal beating.

¶ 39        By contrast, the trial court again referenced the credible nature of Luera's testimony. The court stated that in all its years on the bench, "Ermelida Luera was one of the most astonishing, amazing, sincere, credible, believable witnesses I have and probably ever will hear testify in the court." It reiterated that Luera had identified many of the individuals later shown by evidence to have been present and had never been shown to have misidentified anyone. And her testimony was that petitioner was one of the people who was punching and kicking Reyes that night. Accordingly, the trial court concluded that there was no probability that the outcome of the trial would have been different if a factfinder heard the testimony of Ollie and Smith. This appeal followed.

¶ 40                                        II. ANALYSIS

¶ 41        Petitioner's primary argument on appeal is that the trial court erred in denying his postconviction petition on its merits following the evidentiary hearing. He points out that, with the testimony of Ollie and Smith, five eyewitnesses have now testified consistently that petitioner was across the street and not a participant in the beating of Reyes. He argues that, in light of the problems that existed with the identification testimony of each of the three eyewitnesses presented by the State at trial, the trial court's conclusion that the new testimony by Ollie and Smith did not undermine its confidence in his guilt constitutes manifest error.

¶ 42        In an appeal where the trial court has denied the relief sought in a postconviction petition following an evidentiary hearing at which it considered new evidence and weighed the credibility of witnesses, the trial court's determination will be reversed only if it is manifestly erroneous.

*People v. Morgan*, 212 Ill. 2d 148, 155 (2004). An error must be clearly evident, plain, and indisputable to meet this standard and warrant reversal. *Id.*

¶ 43     To obtain a new trial in a postconviction claim of actual innocence, a petitioner must present evidence that is (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive nature that it would probably change the result on retrial. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). In this case, the trial court dismissed the petition based upon its conclusion that the testimony of Ollie and Smith was not sufficiently conclusive as to probably change the result on retrial. We thus begin with this element involving the "conclusive" nature of the evidence.

¶ 44     The conclusive nature of new evidence is the most important element of an actual innocence claim. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). The evidence must be of a character that, when considered along with the trial evidence, would probably lead to a different result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *Ortiz*, 235 Ill. 2d at 336-37). In other words, the trial court must consider whether the new evidence "places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Id.* ¶ 97. "This is a comprehensive approach and involves credibility determinations that are uniquely appropriate for trial judges to make." *Id.* The standard is one of probability, not certainty, because the trial court is effectively predicting what another trier of fact would likely do if it considered all the evidence, both old and new, together. *Id.*; accord *People v. Sanders*, 2016 IL 118123, ¶ 47 ("We must be able to find that petitioner's new evidence is so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt.").

¶ 45     As stated, petitioner argues that the trial court reached a manifestly erroneous conclusion that it is not probable that the testimony of Ollie and Smith, when considered together with the evidence presented at trial and at the evidentiary hearing on his posttrial motion for new trial, would lead to

a different outcome on retrial. Specifically, petitioner contends that the foundation for his conviction is "shaky" due to various problems with the eyewitness testimony presented by the State. Among the shortcomings cited by petitioner are the following. Holowka had a prior theft-related conviction, had been drinking before witnessing the events, and did not identify petitioner in a lineup until four months after the incident. Gomez's view of events from his third-floor window was limited by a tree and by darkness, he gave an implausible story that 10 minutes passed between Reyes being pulled from the car and the start of the beating, and he "flip-flopped" twice by recanting his statement in an affidavit and by later asserting he had done so falsely. Luera was unfamiliar with anybody present prior to that day, the scene of events from which she identified multiple participants was chaotic and lasted only a minute or two, and she later had an encounter with petitioner's counsel in the courthouse hallway in which she said that everybody involved had looked alike and that she could not remember what she had seen petitioner do. Also, Torres' testimony about petitioner looking at Holowka's car earlier that afternoon provides an innocent explanation for petitioner's fingerprint being found on the rear passenger-side window.

¶ 46        Petitioner contrasts the "shaky" nature of the State's identification evidence with the fact that five witnesses (Vergara, Ares, Medina, Ollie, and Smith) have now testified that petitioner did not participate in the beating of Reyes. He contends that they all testified consistently that petitioner was standing across the street with another person when the beating occurred and that he did not take part in it. Petitioner takes issue with the extent to which the trial court found each of these witnesses incredible based on their inability to identify additional participants. He contends that Ollie and Smith did name others involved, specifically "Heck" and "Thriller," and he asserts that it is not unreasonable that they would know these gang members only by nicknames. Petitioner further takes issue with the trial court's belief that additional people were involved in the beating

whom these witnesses refused to name, contending this amounts to speculation by the trial court.

¶ 47    We have thoroughly reviewed the testimony of Ollie and Smith, together with that of the other witnesses cited above. After doing so, we find no manifest error in the trial court's conclusion that the testimony of Ollie and Smith was not of such conclusive character that it would probably change the result on retrial. The trial court's conclusion was based largely on its own assessment of the credibility of all the respective witnesses who had testified before it. Given the trial court's superior perspective of observing the live testimony of all these various witnesses at the bench trial and the later evidentiary hearings, we are particularly deferential to its determination of which witnesses provided believable testimony and which witnesses did not. See *People v. Coleman*, 183 Ill. 2d 366, 384 (1998) ("the post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a 'position of advantage in a search for the truth' which 'is infinitely superior to that of a tribunal where the sole guide is the printed record' "), quoting *Johnson v. Fulkerson*, 12 Ill. 2d 69, 75 (1957)); *People v. Carter*, 2021 IL App (4th) 180581, ¶ 68 (when trial court serving as factfinder states whom it believes and whom it does not, appellate court acts "at the height of our deference" to such finding); accord *Coleman*, 2013 IL 113307, ¶ 97 (determination of whether new evidence is conclusive involves "credibility determinations that are uniquely appropriate for trial judges to make").

¶ 48    Based on our own review of their testimony, we reject petitioner's assertion that the trial court placed too little weight on the consistency of testimony that petitioner was across the street when the beating occurred and placed undue emphasis on the witnesses' inability to recall the real names of everyone who was present at the scene or who participated in the beating. It is evident from the trial court's own inquiry that its questions on these points were to ascertain whether Ollie and Smith were attempting to be fully truthful and forthcoming to the court about everything they

could remember from the beating of Reyes. Were they providing a level of detail about the events surrounding the beating that bolstered the trial court's belief that they were being honest when they stated that petitioner was not involved? Or, having served their sentences and facing no further possibility of punishment, were they merely trying to help their friend by stating that he had not been part of the group involved in the beating? The trial court found this to be the latter situation.

¶ 49    We find nothing manifestly erroneous about this credibility determination or about the trial court's conclusion that the testimony of Ollie and Smith did not undermine its confidence that the finding of petitioner's guilt was factually correct. The trial court reiterated that it had found Luera to be one of the most credible witnesses ever to have testified before it, that Luera was shown to have correctly identified many of the individuals present, and that one of the men she identified as participating in the beating was petitioner. Luera's testimony identifying petitioner was corroborated by the testimony of Holowka and Gomez, both of whom also independently identified petitioner as a participant in the beating. And it was corroborated by the fact that petitioner's fingerprint was found on the rear passenger-side window of Holowka's car, where multiple witnesses testified that a group of young men had pulled Reyes out of the car immediately prior to the beating. The determination that this evidence of petitioner's guilt was not placed in a different light or undermined by the testimony of Ollie or Smith was within the province of the trial court, and we find no clearly evident, plain, or indisputable error in the trial court's conclusion.

¶ 50    Based on petitioner's failure to present evidence of such conclusive nature that it would probably change the result on retrial, the trial court's denial of the merits of petitioner's postconviction claim of actual innocence is affirmed.

¶ 51    In his brief, petitioner raises a second, alternative argument, which is that his postconviction counsel failed to provide reasonable assistance during the second stage of these proceedings by

failing to amend his petition to add a claim, not raised in his *pro se* petition, that his trial counsel had been ineffective for not calling Ollie as a trial witness or making use of Smith's videotaped statement in which he said to police that petitioner had not touched or hit Reyes. Petitioner's contention is that postconviction counsel should have added this ineffective assistance of trial counsel claim in the event that the testimony of Ollie and Smith was found not to satisfy the "newly discovered" element of his actual innocence claim. See *supra* ¶ 31; *Ortiz*, 235 Ill. 2d at 333 (evidence of actual innocence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive nature that it would probably change the result on retrial).

¶ 52    Based on the source of the right to counsel being statutory rather than constitutional, petitioners in postconviction proceedings are entitled to receive a "reasonable" level of assistance from counsel. *People v. Addison*, 2023 IL 127119, ¶ 19. This is a standard "significantly lower" than the right to "effective" assistance constitutionally afforded at trial prior to conviction. *People v. Custer*, 2019 IL 123339, ¶¶ 30-31. To ensure that postconviction petitioners receive a reasonable level of assistance, several specific duties are imposed on postconviction counsel by Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). *Addison*, 2023 IL 127119, ¶ 20. That rule requires the record to show that counsel has (1) consulted with the petitioner to ascertain his or her contentions of deprivation of constitutional rights, (2) examined the record of the proceedings at trial, and (3) "made any amendments to the petitions filed *pro se* that are necessary for an adequate presentation of petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017).

¶ 53    Under Rule 651(c), providing a "reasonable" level of assistance requires counsel to make those amendments to a *pro se* postconviction petition that are necessary to overcome procedural bars that would otherwise result in its dismissal. *People v. Perkins*, 229 Ill. 2d 34, 44 (2007). However, it is also well-established that postconviction counsel " 'is only required to investigate

and properly present the *petitioner's* claims,' " and counsel has no obligation to raise new claims or additional issues not included in the original petition. (Emphasis in original.) *People v. Pendleton*, 223 Ill. 2d 458, 475-76 (2006) (quoting *People v. Davis*, 156 Ill. 2d 149, 164 (1993)); accord *People v. Collins*, 2021 IL App (1st) 170597, ¶¶ 39-40.

¶ 54    In this case, the only claim raised by petitioner in his *pro se* postconviction petition was that he was actually innocent of the crime of which he had been convicted, *i.e.*, the first degree murder of Reyes. No procedural bar prevented consideration of this claim on its substantive merits, as shown by the fact that petitioner received a full evidentiary hearing on it. But the possibility *ex ante* that the testimony of Ollie and Smith might not qualify as "newly discovered" evidence in an actual innocence claim did not obligate postconviction counsel to amend the petition to add a claim of ineffective assistance of trial counsel. Adding an ineffective assistance claim would not have overcome any procedural hurdle to the consideration of a claim of actual innocence. Instead, at best it would have resulted in the consideration of a completely different claim of constitutional deprivation involving the right to effective assistance of counsel. Petitioner's argument implicates the raising of a new claim that is substantively distinct from the one petitioner raised, not of ensuring the claim petitioner raised is presented in a form adequate for consideration. As counsel had no obligation to raise a new claim of ineffective assistance at the second stage (*Pendleton*, 223 Ill. 2d at 476), we reject petitioner's argument that counsel failed to provide reasonable assistance.

¶ 55                                      III. CONCLUSION

¶ 56    For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 57    Affirmed.